UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAYER SCHERA PHARMA AG and
BAYER HEALTHCARE
PHARMACEUTICALS INC.,

                Plaintiffs,

   –v. –

SANDOZ, INC., WATSON
PHARMACEUTICALS, INC., and
WATSON LABORATORIES, INC.,

                Defendants.

08 Civ. 03710 (PGG)
08 Civ. 08112 (PGG)

**MEMORANDUM OPINION
AND ORDER**

PAUL G. GARDEPHE, U.S.D.J.

        These two patent infringement actions arise from Defendants' filing of Abbreviated New Drug Applications concerning two of Plaintiffs' brand-name oral contraceptive prescription drugs: Yasmin and Yaz.

        Bayer Schera Pharma AG and Bayer Healthcare Pharmaceuticals Inc. ("Bayer") have moved to dismiss six counterclaims which Defendant Sandoz, Inc. asserts in its answers. These counterclaims allege violations of the Sherman Act and claims under New York law for unfair competition, tortious interference with prospective economic advantage, and malicious prosecution.[1] For the reasons set forth below, Bayer's motions to dismiss will be GRANTED.

---

[1] Sandoz has voluntarily withdrawn its malicious prosecution counterclaims. (Sandoz Yasmin Opp. Br. 4; Sandoz Yaz Opp. Br. 4)

I.      **LEGAL STANDARD**

"To survive a motion to dismiss," a counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In making this determination here, this Court is mindful of two corollary rules.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Id.  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  (citing Twombly, 550 U.S. at 555).  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 1950 (citing Twombly, 550 U.S. at 556).  The Supreme Court has noted that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. (citation omitted).

II.     **BAYER'S MOTIONS TO DISMISS WILL BE GRANTED**

   A.   **Sandoz's Counterclaims for Monopolization, Conspiracy to Monopolize, and Conspiracy in Restraint of Trade Will Be Dismissed**

In each action, Sandoz alleges four types of antitrust violations:  (1) monopolization in violation of § 2 of the Sherman Act[2] (Yasmin Cntrcl. ¶¶ 71, 77-78; Yaz Cntrcl. ¶¶ 73, 75-76); (2) conspiracy to monopolize in violation of § 2 of the

---

[2] "The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

2

Sherman Act[3] (Yasmin Cntrcl. ¶¶ 77-78; Yaz Cntrcl. ¶¶ 73-74); (3) conspiracy in restraint of trade in violation of § 1 of the Sherman Act[4] (Yasmin Cntrcl. ¶ 79; Yaz Cntrcl. ¶ 77); and (4) attempted monopolization in violation of § 2 of the Sherman Act.[5] (Yasmin Cntrcl. ¶¶ 71-72, 78; Yaz Cntrcl. ¶¶ 73-74, 78)

"'In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized.'" Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 575 (S.D.N.Y. 2007) (quoting Xerox Corp. v. Media Sciences Int'l, Inc., 511 F. Supp. 2d 372, 382-82 (S.D.N.Y. 2007)).  Because Bayer does not object

---

[3] Sandoz asserts that its conspiracy to monopolize claim arises under § 1 of the Sherman Act.  (Sandoz Yasmin Opp. Br. 4; Sandoz Yaz Opp. Br. 4).  In its pleadings, however, Sandoz cites § 2 (Yasmin Cntrcl. ¶¶ 77-78; Yaz Cntrcl. ¶¶ 73-74), and all of the cases Sandoz relies on in discussing its conspiracy to monopolize claim (see Sandoz Yasmin Opp. Br. 6-7; Sandoz Yaz Opp. Br. 7) discuss the elements of a § 2 conspiracy to monopolize claim.  See AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 233 (2d Cir. 1999) (per curiam) ("A successful conspiracy claim under section 2 requires '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'") (quoting Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 795 (2d Cir. 1987)); Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1158 (9th Cir. 2003) (listing elements of a § 2 conspiracy to monopolize claim); Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1028 (10th Cir. 2002) (same); Levine v. Cent. Florida Med. Affiliates, Inc., 72 F.3d 1538, 1556 (11th Cir. 1996) (same).  Accordingly, this Court will construe Sandoz's conspiracy to monopolize claim as arising under § 2.

[4] "To prove a conspiracy (or contract) in restraint of trade in violation of Section 1 of the Sherman Act, a plaintiff must prove two elements:  '(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade.'"  Freeland v. AT&T Corp., 238 F.R.D. 130, 153 (S.D.N.Y. 2006) (quoting Geneva Pharm. Tech. Corp. v. Barr Lab. Inc., 386 F.3d 485, 506 (2d Cir. 2004)).

[5] "[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993) (citation omitted).

3

to the geographic market Sandoz alleges – the United States – the only issue before the Court is whether Sandoz has properly defined a relevant product market.

Bayer argues that Sandoz's antitrust counterclaims must be dismissed because Sandoz has alleged a relevant product market that is implausibly narrow. For three of its antitrust counterclaims – i.e., monopoly, conspiracy to monopolize, and conspiracy in restraint of trade – Sandoz asserts narrow market definitions based on each drug's active ingredients. Accordingly, Sandoz's market definitions are effectively based on brand.

For Yasmin, Sandoz claims that the relevant product market is "the drospirenone[6](=dihydrospirorenone)/ethinylestradiol[7] market" ("Yasmin Active Ingredient Market") (Yasmin Cntrcl. ¶¶ 71-73). For Yaz, Sandoz asserts that the relevant market is "the ethinylestradiol/drospirenone market, including any low-dose of ethinylestradiol/drospirenone submarket." ("Yaz Active Ingredient Market") (Yaz Cntrcl. ¶ 70) Bayer argues that by limiting the relevant product markets to each drug's active ingredients, Sandoz has pleaded "strange red-haired, bearded, one-eyed man with a limp[-type]" markets, Belfiore v. The New York Times Co., 654 F. Supp. 842, 846 (D. Conn. 1986), aff'd, 826 F.2d 177 (2d Cir. 1987)), which are markets so narrow that they cannot sustain an antitrust claim. Bayer further argues that Sandoz has not pled sufficient facts to support a unique market for each drug, and notes that courts are reluctant to

---

[6] Drospirenone is a "spironolactone analogue" that "acts as a progestational agent and is used in combination with an estrogen component as an oral contraceptive." Dorland's Illustrated Medical Dictionary at 575 (31st ed. 2007).

[7] Ethinylestradiol is a derivative of estradiol and is "one of the most potent estrogens." Dorland's Illustrated Medical Dictionary at 658. Ethinylestradiol is used "in combination with a progestational agent in oral contraceptives. . . ." Id.

4

accept single-brand or unique markets.  Finally, Bayer contends that the relevant product markets posited by Sandoz are illogical and irrational, and require dismissal of Sandoz's antitrust counterclaims.

      Sandoz argues that it acted properly in defining the relevant product markets by the active ingredients in Yasmin and Yaz, because it is these active ingredients that give these drugs their unique therapeutic properties.  For example, Sandoz alleges that – because of its unique active ingredients – Yasmin is the only contraceptive that prevents both acne and reduces fluid retention.  Similarly, Sandoz alleges that Yaz, because of its unique active ingredients, is the only birth control agent that is efficacious for moderate acne and premenstrual dysphoric disorder.  Sandoz argues that courts have accepted unique markets in the past and that unique markets are appropriate here in light of the unique properties of each contraceptive.

      **1.**    **Legal Framework**

      "The relevant market for purposes of antitrust litigation is the 'area of effective competition' within which the defendant operates." AD/SAT, a Division of Skylight, Inc., 181 F.3d at 227 (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961)).  In other words, "[t]he goal in defining the relevant market is to indentify market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." Geneva Pharma. Tech. Corp., 386 F.3d at 485.

      "The alleged product market 'must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross elasticity of demand. . . .'" Arista Records LLC, 532 F. Supp. 2d at 575 (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)).

"Interchangeability looks to the use or function of the given product as compared to other products." Intellective, Inc. v. Massachusetts Mut. Life Ins. Co., 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002) (quotation marks omitted). "Cross-elasticity is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product." Id. (quotation marks omitted).

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead relevant product market." Todd, 275 F.3d at 199-200; see also Arista Records LLC, 532 F. Supp. 2d at 575 (same). "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Todd, 275 F.3d at 200 (citation omitted). In fact, "[c]ases in which dismissal on the pleading is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Id. (footnote omitted); see also McCagg v. Marquis Jet Partners, 05 Civ. 10607 (PAC), 2007 WL 2454192, at *5 (S.D.N.Y. Mar. 29, 2007) (explaining that plaintiffs must offer "a theoretically rational explanation for why the boundaries of the market are defined as they are" and must "define the market according to the rules of interchangeability and cross-elasticity") (quotation and citation omitted); Intellective, Inc., 190 F. Supp. 2d at 609 (explaining that dismissal on the pleadings is appropriate where a plaintiff fails to "allege facts regarding substitute products, distinguish among comparable products, or allege facts relating to cross-elasticity of demand" or where plaintiff's allegations are not

6

"plausible"); A & E Prods. Group L.P. v. The Accessory Corp., 00 Civ. 7271 (LMM), 2001 WL 1568238, at *2 (S.D.N.Y. Dec. 7, 2001) (explaining that relevant market allegations should include (1) "all products reasonably interchangeable, where there is cross-elasticity of demand"; and (2) "products [that] can be effectively substituted for the product allegedly being monopolized"; and explain "why the market alleged is a relevant, economically significant market, that is unique").

### 2. The Markets Alleged by Sandoz Are Implausibly Narrow

#### a. The Alleged Active Ingredient Markets

In pleading that the relevant product market for Yasmin is the Yasmin Active Ingredient Market, Sandoz alleges:

> Yasmin is marketed as having unique antimineralocorticoid[8] (antialdosterone) and anti-androgenic properties, allowing for exceptional control of acne and a reduction in fluid retention-related symptoms. In particular, Yasmin's success in the marketplace is based on studies that show it causes significantly less fluid retention when compared to other oral contraceptive pills, while providing similar contraceptive ability. Fluid retention is one of the primary reasons for women to discontinue the use of oral contraceptives. Many women suffer significantly from the fluid retention associated with other oral contraceptives. There are no products that are reasonably interchangeable by consumer[s].

(Yasmin Cntrcl. ¶ 73) Sandoz alleges that "[t]he relevant market therefore is the drospirenone(=dihydrospirorenone)/ethinylestradiol market given the unique properties of this contraceptive combination."  (Id.)

With respect to the Yaz Active Ingredient Market, Sandoz alleges:

---

[8]  An antimineralocorticoid is "a substance that suppresses the secretion or opposes the action of mineralocorticoids."  Dorland's Illustrated Medical Dictionary at 108. Mineralocorticoids are "any of the group of C21 corticosteroids . . . involved in the regulation of electrolyte and water balance. . . ."  Id. at 1185.

7

> YAZ is marketed as having a unique property allowing for the treatment of premenstrual dysphoric disorder (PMDD), a mood disorder related to the menstrual cycle that significantly interferes with work, school, social activities, and relationships with others, in women taking contraceptives. YAZ is the ONLY birth control proven to treat the emotional and physical symptoms of PMDD. It may also be used to treat moderate acne in women who are able and wish to use the pill for birth control. YAZ's success in the marketplace is based on such activities.
>
> YAZ's activity is associated with its unique progestin/estrogen composition (that is, ethinylestradiol/drospirenone), in conjunction with the fact that its estrogen (ethinylestradiol) is of significantly lower dose due to its clatharation with betadex.
>
> There are no products that are reasonably interchangeable by consumers suffering from PMDD and moderate acne, or PMDD alone.

(Yaz Cntrcl. ¶¶ 68-70)  Sandoz alleges that "[t]he relevant market therefore is the ethinylestradiol/drospirenone market, including any low-dose of ethinylestradiol/drospirenone submarket, given the unique properties of this contraceptive combination."  (Id.)

### b. The Posited Markets are Implausible and Irrational

Sandoz alleges that both Yasmin and Yaz are unique products that are markets unto themselves (Yasmin Cntrcl. ¶ 73; Yaz Cntrcl. ¶ 70), but defines the market for each drug in the same way.  For Yasmin, Sandoz alleges that the relevant product market is the "drospirenone (=dihydrospirorenone)/ethinylestradiol market" (Yasmin Cntrcl. ¶ 73), and for Yaz, the relevant market is the "ethinylestradiol/drospirenone market, including any low-dose of ethinylestradiol/drospirenone submarket."[9]  (Yaz

---

[9] It is not clear why Sandoz refers to the Yasmin Active Ingredient Market as the drospirenone(=dihydrospirorenone)/ethinylestradiol market (Yasmin Cntrcl. ¶ 73) and then reverses the order of the ingredients in defining the Yaz Active Ingredient Market. (Yaz Cntrcl. ¶ 70)  If the order of the ingredients has any scientific significance, it is not explained, and Sandoz reverses the order of the ingredients at will.  (See, e.g., Sandoz

8

Cntrcl. ¶ 70)  In other words, Sandoz alleges that Yasmin and Yaz are unique as against other contraceptives and as to each other – because of their active ingredients – but then posits separate unique markets for Yaz and Yasmin based on the same active ingredients: ethinylestradiol and drospirenone.

While two drugs made from the same active ingredients may be unique as to each other, it is Sandoz's burden to offer a "theoretically rational explanation for why the boundaries of the market are defined as they are."  McCagg, 2007 WL 2454192, at *5; Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp., 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001) (same); see also Hack v. President & Fellows of Yale College, 237 F.3d 81, 86 (2d Cir. 2000) abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ("To survive a motion to dismiss, however, the alleged . . . product market must be plausible"); Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Ed., Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993) ("Plaintiff must explain why the market it alleges is in fact the relevant, economically significant product market.").

Here, Sandoz has not offered any explanation.  It has not alleged, for example, that Yasmin and Yaz are unique as against each other because they contain different amounts of the active ingredients or different forms of the active ingredients. Because Sandoz has not offered any explanation for Yasmin and Yaz's alleged uniqueness, the asserted relevant product markets are irrational and illogical, and Sandoz's antitrust counterclaims must be dismissed to the extent that they rely on the Active Ingredient Market allegations.  See McCagg, 2007 WL 2454192, at *6 (granting motion to dismiss because the "Amended Complaint fails to allege a plausible market" as

---

Yasmin Opp. Br. 8 (explaining that the relevant market for Yasmin is the "ethinylestradiol/drospirenone" market)).

9

the Court is "not require[d] . . . to ignore its common sense" when analyzing plaintiff's product-market allegations); Yellow Pages Solutions, Inc. v. Bell Atl. Yellow Pages Co., 00 Civ. 5663 (MBM), 2001 WL 1468168, at *12 (S.D.N.Y. Nov. 19, 2001) (granting motion to dismiss and explaining that "a complaint in an antitrust case must allege a basis for finding that the product alleged to have been monopolized is in some way unique, that it is a market unto itself"); Commercial Data Servers, Inc., 166 F. Supp. 2d at 897 (granting motion to dismiss because plaintiff "has failed to allege any facts explaining why the relevant market is limited to mainframes compatible with IBM's licensed . . . operating system"); Beyer Farms, Inc. v. Elmhurst Dairy, Inc., 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001), aff'd, 35 Fed App'x 29 (2d Cir. 2002) (granting motion to dismiss because plaintiff "failed to make sufficient [product market] allegations" and did "not explain what fluid milk products are") (quotation marks omitted); Re-Alco Indus., Inc., 812 F. Supp. at 392 (granting motion to dismiss because "[p]laintiff has made no showing why Growing Healthy materials should be considered a market unto themselves"); see also Apple Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1199 (N.D. Cal. 2008) (granting motion to dismiss and noting that "[t]he pleading as a whole does not allege facts that, if true, plausibly indicate that Mac OS is a an independent, single-product market")

    Sandoz's arguments to the contrary are not persuasive.  First, Sandoz argues that the two alleged Active Ingredients Markets are different because the Yasmin Active Ingredient Market is the entire "ethinylestradiol/drospirenone" market (Sandoz Yasmin Opp. Br. 8), while the Yaz Active Ingredient Market is the "low-dose ethinylestradiol/Drospirenone" market.  (Sandoz Yaz Opp. Br. 8-9, 12)  While it is possible that a low-dose market may form a separate market or even a sub-market of the

10

overall ethinylestradiol/drospirenone market, that is not what Sandoz alleged in its counterclaims. Instead, Sandoz alleged – as to Yaz – that "[t]he relevant market . . . is the ethinylestradiol/drospirenone market, including any low-dose of ethinylestradiol/drospirenone submarket." (Yaz Cntrcl. ¶ 70) (emphasis added)

Second, Sandoz argues that relevant product markets are often defined in terms of drug formulations. (Sandoz Yasmin Opp. Br. 10-11; Sandoz Yaz Opp. Br. 10-11) The cases Sandoz relies on, however, shed no light on the issue here. In three of the cases, the issue of relevant product market was not litigated; the court merely accepted the product market asserted by plaintiffs. See In re Cardizem CD Antitrust Litig., 332 F.3d 896, 911 (6th Cir. 2003); Andrx Pharm., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 807 (D.C. Cir. 2001); In re Remeron Antitrust Litig., 335 F. Supp. 2d 522, 529 (D.N.J. 2004). Nabi Biopharms. v. Roxane Labs., Inc., also cited by Sandoz, deals only with the issue of whether a plaintiff may plead alternative theories as to relevant product market. See 05 Civ. 889, 2007 WL 894473, at *6-7 (S.D. Ohio Mar. 21, 2007).

Finally, Sandoz argues that it need not take a position – at this stage of the litigation – as to whether Yaz and Yasmin are in the same product market. (Sandoz Yaz Opp. Br. 13) Sandoz argues that because only Bayer markets ethinylestradiol/drospirenone contraceptives, it holds monopoly power in all ethinylestradiol/drospirenone markets. (Id.) Sandoz's argument misses the point. "To survive a motion to dismiss, . . . the alleged . . . product market must be plausible." Hack, 237 F.3d at 86. Here, Sandoz has posited two separate product markets based on two drugs that rely on the same active ingredients: ethinylestradiol and drospirenone. On its

face, this is implausible and irrational.[10]  Accordingly, Sandoz's counterclaims based on monopolization in violation of § 2 of the Sherman Act, conspiracy to monopolize in violation of § 2 of the Sherman Act, and conspiracy in restraint of trade in violation of § 1 of the Sherman Act will be dismissed with leave to amend.[11]

---

[10]  Although "in some instances one brand of a product can constitute a separate market," Eastman Kodak Co. v. Image Tech. Serv., Inc., 504 U.S. 451, 482 (1992), antitrust claims based on single-brand or unique product markets often do not survive motions to dismiss. See Todd, 275 F.3d at 200 (explaining that motions to dismiss are often granted when the pleadings consist of "failed attempts to limit a product market to a single brand"); B.V. Optische Industrie de Oude Delft v. Holgic, Inc., 909 F. Supp. 162, 171 (S.D.N.Y. 1995) (granting motion to dismiss and explaining that "[m]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market"); Belfiore, 654 F. Supp. at 846 ("Plaintiffs' attempt to define the relevant market 'from the product out' is rejected."); see also Apple, Inc., 586 F. Supp. 2d at 1198 ("In general, a manufacturer's own products do not themselves comprise a relevant product market. . . .") (quotation omitted).  Accordingly, if Sandoz chooses to file amended counterclaims alleging antitrust violations, it must be mindful that "the natural monopoly every manufacturer has in the production and sale of its own product cannot be the basis for antitrust liability." Belfiore, 654 F. Supp. at 846.

[11]  Sandoz's counterclaims also plead – with respect to its attempted monopolization claims – that the relevant product market is the entire U.S. oral contraceptive market. (Yasmin Cntrcl. ¶¶ 72, 78; Yaz Cntrcl. ¶¶ 71, 75; see Sandoz Yasmin Opp. Br. 16; Sandoz Yaz Opp. Br. 17)  In its opening briefs, Bayer argued that this alternative product market is implausible because Bayer only holds a 50% market share, and a 50% market share is inadequate to show market power.  (Bayer Yasmin Br. 10; Bayer Yaz Br. 12)  In response, Sandoz contended – correctly – that it need not allege an existing dominant market share in order to plead an attempted monopolization claim.  (Sandoz Yasmin Opp. Br. 16-17; Sandoz Yaz Opp. Br. 16-17; see Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1437 (9th Cir.), cert. denied, 516 U.S. 987 (1995))  In reply, Bayer abandoned its inadequate market share argument and asserted several new theories as to why Sandoz's counterclaims for attempted monopolization should be dismissed.  (Bayer Reply Br. 10-14)  "[N]ew arguments may not be made in a reply brief," Ernst Haas Studio, Inc. v. Palm Press, Inc., 164 F.3d 110, 112 (2d Cir. 1999), and this Court cannot rely on such arguments to dismiss Sandoz's attempted monopolization claims.

If Sandoz chooses to file an amended complaint, however, it should re-examine its attempted monopolization counterclaims in light of the Supreme Court's declaration that "[t]hreadbare recitals of the elements of a cause of action[] supported by mere conclusory statements[] do not suffice" to survive a motion to dismiss.  Iqbal, 129 S. Ct. at 1949.

### B.     Sandoz's Unfair Competition Counterclaims Will Be Dismissed

In support of its New York common law unfair competition counterclaims, Sandoz alleges that Bayer is "asserting a patent which it knows to be invalid and/or unenforceable and which it has no good faith belief to be infringed." (Yasmin Cntrcl. ¶ 83; Yaz Cntrcl. ¶ 81)  Sandoz further alleges that Bayer has "undertaken activities to interfere with defendant Sandoz's present and future business interests regarding the sales of its generic [Yasmin or Yaz] product."  (Yasmin Cntrcl. ¶ 83; Yaz Cntrcl. ¶ 81)  Finally, Sandoz claims that Bayer has asserted unenforceable patents "for the purpose of creating litigation costs that are excessive relative to market share" and "irrespective of its knowledge that" its patent "is invalid or unenforceable. . . ."  (Yasmin Cntrcl. ¶¶ 83-83; Yaz Cntrcl. ¶¶ 81-82)

New York courts "have long recognized two theories of common-law unfair competition:  palming off and misappropriation."  ITC Ltd. v. Punchgini, Inc. 9 N.Y.2d 467, 476 (2007) [12]; Johnson & Johnson v. The Am. Nat'l Red Cross, 552 F. Supp. 2d 434, 446 (S.D.N.Y. 2008) (same).  Palming off "is the sale of the goods of one manufacturer as those of another."  Id.  For example, "[o]ne of the most obvious forms of palming off occurs when the copier of an article overtly and explicitly misrepresents its

---

[12]  Sandoz argues that a New York unfair competition claim can encompass "any form of commercial immorality," and that the New York Court of Appeals decision in ITC Ltd. should not be interpreted as limiting unfair competition theories of liability to only palming off and misappropriation.  (Sandoz Yasmin Opp. Br. 19-20; Sandoz Yaz Opp. Br. 20-21)  Sandoz relies, however, solely on cases that were decided prior to ITC Ltd. or that discuss only palming off or misappropriation.  Moreover, Sandoz fails to acknowledge that long before ITC Ltd. the Second Circuit had ruled that the unfair competition cause of action does not encompass conduct that is merely unfair.  See Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).

13

source [, such as when] [a] defendant . . . substitute[s] its product for plaintiff's when customers specifically ask[] for plaintiff's product." Id. n.2 (quotation omitted).

Here, Sandoz has not stated a claim for palming off, because it has not alleged that Bayer has passed off Sandoz's product as its own. To the contrary, Sandoz alleges that Bayer's actions have prevented Sandoz from marketing its proposed generic oral contraceptive products. Accordingly, Sandoz has not stated an unfair competition claim under the palming off theory of liability.

As to the second unfair competition theory, "[m]isappropriation consists of the taking advantage in bad-faith of 'the results of the skill, expenditures and labors of a competitor[.]'" Johnson & Johnson, 552 F. Supp. 2d at 446 (quoting ITC Ltd., 9 N.Y.2d at 477). Sandoz has not alleged that Bayer took advantage of Sandoz's skill, expenditures or labors in marketing its oral contraceptives.

Relying on Gleason Works v. Oerlikon Geartec, AG, 141 F. Supp. 2d 334, 337-38 (W.D.N.Y. 2001), however, Sandoz contends that a party who commences a patent infringement action in bad faith can be found to have engaged in unfair competition. (Sandoz Yasmin Opp. Br. 20; Sandoz Yaz Opp. Br. 21) .

In Gleason Works, plaintiff filed suit alleging that defendant was infringing its patent for a gear-making machine, and defendant responded with a counterclaim for common law unfair competition based on a theory that plaintiff had brought the patent infringement suit "without probable cause." Gleason Works, 141 F. Supp. 2d at 338. In denying summary judgment on this unfair competition claim, the court noted that "[i]n the patent context, while it is not clearly established, there is at least

14

some authority to support a claim of unfair competition against a patentee who commences a patent infringement action in bad faith." Id.

This Court will not follow Gleason Works. The weight of authority clearly holds that bad faith litigation – including bad faith patent infringement litigation – does not give rise to an unfair competition claim under New York law. See CA, Inc. v. Simple.com, Inc., 621 F. Supp. 2d 45, 53, 54 n.4 (E.D.N.Y. 2009) (granting summary judgment on unfair competition claim based on alleged bad faith patent infringement action; explicitly rejecting Gleason Works and noting that "New York apparently does not recognize bad faith litigation as a type of unfair competition"); Moore U.S.A. Inc. v. The Standard Register Co., 139 F. Supp. 2d 348, 361 (W.D.N.Y. 2001) ("New York apparently does not recognize litigation as a type of unfair competition"); Bio-Technology Gen. Corp. v. Genentech, Inc., 886 F. Supp. 377, 384 (S.D.N.Y. 1995) (explaining that the "bringing of the [International Trade Court] action, the Delaware action, false press releases about the outcome of the [International Trade Court] action, and filing a counterclaim against [plaintiff]" are not "recognized predicates for an unfair competition claim under New York law"); Lyle/Carlstrom Assocs., Inc. v. Manhattan Store Interiors, Inc. No. 85 Civ. 4347, 1986 WL 84361, at *750 (S.D.N.Y. Apr. 21, 1986) ("commencement of one or more lawsuits in an effort to enforce a patent does not create a claim for unfair competition in New York"). Cf. Cytyc Corp. v. Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 303 (S.D.N.Y. 1998) (citing only Bio-Technology but inexplicably stating that "[i]t is uncertain whether the initiation of litigation may provide a basis for an unfair competition claim under New York common law").

15

Moreover, the Gleason Works court relied on cases involving federal law and Illinois law in asserting that there is "some authority" that a New York unfair competition claim may be premised on a bad faith patent infringement action. See Gleason Works, 141 F. Supp. 2d at 338.  Spotless Enters., Inc. v. Carlisle Plastics, Inc. 56 F. Supp. 2d 274, 277 (E.D.N.Y. 1999) – cited in Gleason Works – involved a cause of action "best characterized as a [Lanham Act] § 43(a) false advertising claim."  Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1575 (Fed. Cir. 1993), also cited in Gleason Works, involved an unfair competition claim under Illinois law.  In sum, Gleason Works is not persuasive authority on the issue of whether a New York unfair competition claim can be premised on a bad faith patent infringement action.  See CA, Inc., 621 F. Supp. 2d at 54 n.4 (explaining that Gleason is "unpersuasive authority" because it relied on cases that "discussed federal and Illinois state law").

Accordingly, Sandoz's counterclaims for New York common law unfair competition will be dismissed.

### C. Sandoz's Counterclaims for Tortious Interference with Prospective Economic Advantage Will Be Dismissed

Sandoz alleges that it has "a continuing economic advantageous relationship with others for the supply of its generic products," and asserts that Bayer "knowingly interfered with this relationship by filing this lawsuit for the purpose of barring Sandoz and others from beginning to supply generic [Yasmin or Yaz] by delaying their final ANDA approval by the FDA."  (Yasmin Cntrcl. ¶¶ 87-88; Yaz Cntrcl. ¶¶ 85-86)  Sandoz further alleges that Bayer has "intentionally interfered with Sandoz's present and future business interest with respect to making and selling [generic] products." (Yasmin Cntrcl. ¶ 89; Yaz Cntrcl. ¶ 87)

16

In order to establish a claim for tortious interference with prospective economic advantage under New York law, Sandoz "must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003). Here, Bayer argues that Sandoz's tortious interference claims must be dismissed because Sandoz has not specified a "particular, existing relationship" that Bayer interfered with. (Bayer Yasmin Br. 14; Bayer Yaz Br. 17)

Sandoz has not identified any specific business entities with which it had business relationships.[13] "New York courts have dismissed complaints that failed to allege the specific business relationship that was interfered with." Johnson & Johnson, 552 F. Supp. 2d at 464-65 (collecting cases). Prior to Iqbal, New York district courts disagreed as to whether a plaintiff was required to identify specific business relationships in order to make out a claim for tortious interference with prospective economic advantage. See id. at 465 (collecting cases). After Iqbal, it is clear that a claim such as this – which merely "offers 'labels and conclusions' [and] 'a formulaic recitation of the elements of a cause of action'" – will not survive a motion to dismiss. See Iqbal, 129 S. Ct. at 1949. Although Sandoz has alleged that it has a "continuing economic advantageous relationship with others for the supply of its generic products," and that

---

[13] Sandoz argues that it could not identify specific business relationships because of "the strict confidentiality ascribed to contracts for the supply of API [active pharmaceutical ingredients] in the pharmaceutical industry." (Sandoz Yasmin Opp. Br. 22; Sandoz Yaz Opp. Br. 23) Protection of trade secrets or other proprietary information can, of course, be accomplished through entry of a protective order and/or a sealing order. In any event, confidentiality concerns do not excuse a failure to plead the elements of a cause of action.

17

Bayer has interfered with those relationships (Yasmin Cntrcl. ¶ 87; Yaz Cntrcl. ¶ 85), it is entirely unclear whether the "others" referenced are entities that purchase generic drugs from Sandoz, third-party business entities that market Sandoz's products, business entities that supply the raw materials Sandoz uses to manufacture its products, or another type of business. Because Sandoz offers only "[t]hreadbare recitals of [an] element[] of a cause of action, supported by mere conclusory statements," see Iqbal, 129 S. Ct. at 1949, its counterclaims for tortious interference with prospective economic advantage will be dismissed.

## CONCLUSION

For the reasons stated, Bayer's motions to dismiss are GRANTED. Sandoz's counterclaims for malicious prosecution are dismissed without leave to re-plead. Sandoz's counterclaims for monopolization, conspiracy to monopolize, conspiracy in restraint of trade, New York common law unfair competition, and tortious interference with prospective economic advantage are dismissed with leave to amend. Any amended complaint is to be filed by April 8, 2010.

The Clerk of the Court is directed to terminate the motions. [08 Civ. 3710: Docket No. 27; 08 Civ. 8112: Docket No. 21]

Dated:     New York, New York
           March 29, 2009

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge