UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAYER SCHERING PHARMA AG and
BAYER HEALTHCARE
PHARMACEUTICALS, INC.,

       Plaintiffs,
  –v. –

SANDOZ, INC., WATSON
PHARMACEUTICALS, INC., and
WATSON LABORATORIES, INC.,

       Defendants.

**MEMORANDUM OPINION
& ORDER**

08 Civ. 03710 (PGG)
08 Civ. 08112 (PGG)

PAUL G. GARDEPHE, U.S.D.J.

    These actions arise from Defendants' filing of Abbreviated New Drug Applications concerning two of Plaintiffs' brand-name oral contraceptive prescription drugs: Yasmin and Yaz. As a result of two prior decisions[1] and certain stipulations between the parties,[2] only Defendant Sandoz, Inc.'s Sherman Act counterclaims remain to be decided.

    In a March 29, 2010 Memorandum Opinion and Order, this Court dismissed Sandoz's Sherman Act counterclaims but granted leave to amend. Bayer Schera Pharma AG v. Sandoz, Inc., Nos. 08 Civ. 03710(PGG), 08 Civ. 8112(PGG), 2010 WL 1222012, *1 (S.D.N.Y. Mar. 29, 2010).

---

[1] March 29, 2010 Memorandum Opinion and Order (08cv3710 [hereinafter Yasmin] Dkt. No. Dkt. No. 119; 08cv8112 [hereinafter Yaz] Dkt. No. 56); September 28, 2010 Memorandum Opinion and Order (Yasmin Dkt. No. 161). Familiarity with these decisions is presumed.
[2] October 27, 2010 Stipulation and Order Dismissing Certain Counterclaims with Prejudice (Yasmin Dkt. No. 168; Yaz Dkt. No. 98); January 7, 2011 Final Judgment on Certain Claims Under Fed. R. Civ. P. 54(b) (Yasmin Dkt. No. 178); January 11, 2011 Stipulation and Order Dismissing Certain Counterclaims Without Prejudice (Yasmin Dkt. No. 181); March 23, 2011 Order of Dismissal of Claims and Counterclaims (Yaz Dkt. No. 110).

In its original Sherman Act counterclaims, Sandoz posited two separate markets for Yaz and Yasmin based on the active ingredients of each drug: for Yasmin, "the drospirenone (=dihydrospirorenone)/ethinylestradiol market" (Yasmin Cntrcl. ¶¶ 71-73), and for Yaz, "the ethinylestradiol/drospirenone market, including any low-dose of ethinylestradiol/drospirenone submarket." (Yaz Cntrcl. ¶ 70)  Sandoz thus alleged that Yasmin and Yaz are unique as against all other contraceptives and unique as to each other, even though they share the same active ingredients.  Sandoz offered no explanation for this assertion, nor did it cite any case law suggesting that its alleged product markets were appropriate.  After Bayer moved to dismiss, the Court ruled that the two separate product markets posited by Sandoz were implausible and irrational and dismissed the antitrust counterclaims with leave to amend.  Bayer Schera Pharma AG, 2010 WL 1222012, at *4-5.  In granting leave to amend, the Court cautioned Sandoz that if it chose "to file amended counterclaims alleging antitrust violations, it must be mindful that 'the natural monopoly every manufacturer has in the production and sale of its own product cannot be the basis for antitrust liability.'"  Id. at *6 n.10 (quoting Belfiore v. New York Times Co., 654 F. Supp. 842, 846 (D. Conn. 1986)).

In its amended counterclaims, Sandoz now alleges a product market encompassing both Yasmin and Yaz – specifically, a market of "oral contraceptives commonly prescribed also to treat PMDD [premenstrual dysphoric disorder] and associated symptoms."[3] (Yasmin Am. Cntrcl. ¶ 49; Yaz Am. Cntrcl. ¶ 52)  Plaintiffs Bayer Schering Pharma AG and

---

[3]  Sandoz does not define "associated symptoms" in its amended counterclaims.  In its opposition brief, Sandoz states that "associated symptoms" refers to pre-menstrual syndrome ("PMS"). (See Sandoz Br. 10 (referencing PMS); id. at 19 ("the actual demand for both of these products is for an oral contraceptive that also treats PMDD and its associated symptoms, including the less severe PMS and ordinary premenstrual symptoms . . ."; "they are prescribed off-label to treat not just PMDD, but also lesser symptoms of PMDD (i.e., PMS) that are much more pervasive.").

Bayer Healthcare Pharmaceuticals Inc. ("Bayer") have moved to dismiss the amended counterclaims. For the reasons stated below, Bayer's motion to dismiss will be granted.

## DISCUSSION

### I. MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In making this determination, this Court is mindful of two corollary rules. "First, the tenet that a court must accept as true all of the allegations contained in a [counterclaim] is inapplicable to legal conclusions." Id. In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "Second, only a [counterclaim] that states a plausible claim for relief survives a motion to dismiss." Id. at 1950 (citing Twombly, 550 U.S. at 556). The Supreme Court has noted that "[d]etermining whether a [counterclaim] states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Additionally, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby

3

rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

## II.     RELEVANT PRODUCT MARKET

### A.     Pleading Standard

As in its original counterclaims, Sandoz's amended Sherman Act counterclaims allege four types of antitrust violations:  (1) monopolization in violation of § 2 of the Sherman Act[4]  (Yasmin Am. Cntrcl. ¶ 92; Yaz Am. Cntrcl. ¶¶ 87, 90); (2) conspiracy to monopolize in violation of § 2 of the Sherman Act (Yasmin Am. Cntrcl. ¶ 92; Yaz Am. Cntrcl. ¶ 87); (3) conspiracy in restraint of trade in violation of § 1 of the Sherman Act[5] (Yasmin Am. Cntrcl. ¶ 94; Yaz Am. Cntrcl. ¶ 91); and (4) attempted monopolization in violation of § 2 of the Sherman Act.[6]  (Yasmin Am. Cntrcl. ¶¶ 92, 93; Yaz Am. Cntrcl. ¶¶ 87, 89)

"'In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized.'" Arista Records LLC v. Lime Group LLC, 532 F.

---

[4]  "The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

[5]  "To prove a conspiracy (or contract) in restraint of trade in violation of Section 1 of the Sherman Act, a plaintiff must prove two elements:  '(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade.'" Freeland v. AT&T Corp., 238 F.R.D. 130, 153 (S.D.N.Y. 2006) (quoting Geneva Pharm. Tech. Corp. v. Barr Lab. Inc., 386 F.3d 485, 506 (2d Cir. 2004)).

[6]  "[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous  probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." Id.

Supp. 2d 556, 575 (S.D.N.Y. 2007) (quoting Xerox Corp. v. Media Sciences Int'l, Inc., 511 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2007)).

"The relevant market for purposes of antitrust litigation is the 'area of effective competition' within which the defendant operates." AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999) (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961)).  In other words, "[t]he goal in defining the relevant market is to identify market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output."  Geneva Pharma. Tech. Corp. v. Barr Laboratories, Inc., 386 F.3d 485, 485 (2d Cir. 2004).  The Second Circuit has explained that a

> market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.  If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market.

AD/SAT, a Division of Skylight, Inc., 181 F.3d at 228 (emphasis in original) (quotation omitted).

"'A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered.'" PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)).  "The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." Geneva Pharm. Tech. Corp., 386 F.3d at 496 (quoting E.I. du Pont de Nemours & Co., 351 U.S. at 395); see also Intellective, Inc. v. Massachusetts

5

Mut. Life Ins. Co., 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002) ("Every product that can be substituted for the same use or purpose should be included within a single product market.").

"The alleged product market 'must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross elasticity of demand. . . .'" Arista Records LLC, 532 F. Supp. 2d at 575 (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)); see also Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 480-81 (S.D.N.Y. 2001) ("The product market inquiry focuses on the range of products that actually compete in the disputed market, and that inquiry turns on the concepts of reasonable interchangeability and cross-elasticity of demand."). "'Interchangeability' looks to the use or function of the given product as compared to other products." Intellective, Inc., 190 F. Supp. 2d at 610. "Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" PepsiCo, Inc., 315 F.3d at 105 (citing FTC v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants.")). "Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Linzer Products Corp. v. Sekar, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007).

"'Cross-elasticity' is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product." Intellective, Inc., 190 F. Supp. 2d at 610.[7]

---

[7] Application of this principle in the prescription drug context is complicated given that (1) patient choice is constrained by the physician's prescribing authority, and (2) the impact of price variation may be blunted by the effect of health insurance.

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead relevant product market." Todd, 275 F.3d at 199-200. "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Id. at 200. Plaintiffs must offer "'a theoretically rational explanation for why the boundaries of the market are defined as they are'" and must "define the market according to the rules of 'interchangeability' and 'cross-elasticity.'" McCagg v. Marquis Jet Partners, Inc., No. 05 CV 10607 PAC, 2007 WL 2454192, at *5 (S.D.N.Y. Mar. 29, 2007) (quoting Comm. Data Servers, Inc. v. IBM Corp., 166 F. Supp. 2d 891, 896, 891 (S.D.N.Y. 2001)); see also A&E Prods. Group L.P. v. The Accessory Corp., 00 Civ. 7271 (LMM), 2001 WL 1568238, at *2 (S.D.N.Y. Dec. 7, 2001) (explaining that relevant market allegations should include (1) "all products reasonably interchangeable, where there is cross-elasticity of demand"; and (2) "products [that] can be effectively substituted for the product allegedly being monopolized"; and should explain "why the market alleged is a relevant, economically significant market, that is unique"). A motion to dismiss "is appropriate where . . . the proposed market makes no rational or economic sense and is far too narrow." McCagg, 2007 WL 2454192, at *6.

  **B.**  <u>**Sandoz's Alleged Product Market is Implausible**</u>

    In its amended counterclaims, Sandoz now defines the relevant market for both Yasmin and Yaz as "oral contraceptives commonly prescribed also to treat PMDD and associated symptoms." (Yasmin Am. Cntrcl. ¶ 49; Yaz Am. Cntrcl. ¶ 52) According to Sandoz, "there currently happens to be only one molecule that performs the dual function that defines the market." (Sandoz Br. 5) That molecule combination is drospirenone and ethinylestradiol. (Yasmin Am. Cntrcl. ¶ 49; Yaz Am. Cntrcl. ¶ 52) In addition to Yasmin and Yaz, two generic

drugs – Barr's Ocella, and Teva's Gianvi – offer that molecule combination and, according to Sandoz, make up the relevant market.[8] (Id.)

Bayer does not object to the geographic market Sandoz alleges – the United States – but argues that the relevant product market alleged in Sandoz's amended counterclaims is "just as implausible and irrational as [Sandoz's] original alleged market." (Bayer Reply Br. 1; see also Bayer Br. 5-6) In particular, Bayer argues that "Sandoz . . . fails to account for most of the widely available substitutes for Yasmin and YAZ." (Id.)

As an initial matter, it must be acknowledged that Sandoz has not simply alleged a broader relevant product market in its amended counterclaims. Instead, it pleads allegations that directly contradict assertions made in its original counterclaims. Sandoz originally alleged that both Yasmin and Yaz are unique. (Yasmin Cntrcl. ¶ 73 ("There are no products that are reasonably interchangeable [with Yasmin for the] consumer."); Yaz Cntrcl. ¶ 70 ("[t]here are no [oral contraceptive] products that are reasonably interchangeable [with Yaz for] customers suffering from PMDD.") Now, Sandoz alleges that the two drugs "are prescribed interchangeably for treatment of PMDD and acne in combination with birth control." (Yasmin Am. Cntrcl. ¶ 42; Yaz Am. Cntrcl. ¶ 45) While Sandoz's unexplained about-face doubtless bears more on its credibility than on the plausibility of its newly pleaded relevant product market – which will rise or fall on its own merits – Sandoz's contradictory pleadings counsel that this Court closely scrutinize the amended counterclaims in ensuring that they meet Rule 12(b)(6) standards.

---

[8] Sandoz alleges that Bayer has sued to remove Gianvi from the market and that Ocella is marketed under an anti-competitive agreement with Bayer. (Sandoz Br. 4; Yasmin Am. Cntrcl. ¶¶ 82-89; Yaz Am. Cntrcl. 52) Because Ocella's pricing is allegedly controlled by Bayer, Sandoz claims that "Bayer . . . continue[s] to control 100% of sales in the Relevant Market." (Yasmin Am. Cntrcl. ¶ 49; Yaz Am. Cntrcl. ¶ 52)

With respect to the prophylactic effects of Yasmin and Yaz, Sandoz concedes that "'[d]ozens of oral contraceptives are available worldwide; most are comparable in terms of efficacy in their primary indication (preventing pregnancy) and safety.'" (Yasmin Am. Cntrcl. ¶ 36; Yaz Am. Cntrcl. ¶ 39) (citations omitted)  Accordingly, the critical question with respect to Sandoz's newly pleaded product market is whether there are substitutes for Yasmin and Yaz available to women seeking not just contraception but relief from PMDD and "associated symptoms."

Sandoz acknowledges that "[o]ther drugs exist for the treatment of PMDD, which is typically treated with an anti-depressant." (Yasmin Am. Cntrcl. ¶ 46; Yaz Am. Cntrcl. ¶ 49)  One class of anti-depressants – selective serotonin re-uptake inhibitor drugs – are prescribed for PMDD but are "not an acceptable substitute for many women who need both birth control and anti-PMDD medication because of the risk of drug interactions and/or additional serious side effects." (Id.)  Sandoz also generally alleges that "several [non-SSRI] drugs, including the antidepressant St. John's Wort, which is commonly taken as a 'natural' treatment for PMDD, are known to decrease the efficacy of oral contraceptives in birth control." (Id.)

These allegations are not sufficient to demonstrate that there is no combination of drugs that can serve as a functional substitute for Yasmin and Yaz.  Accepting the factual allegations concerning SSRI anti-depressants and St. John's Wort as true, Sandoz does not plead facts demonstrating that there are no other anti-depressants or other drugs available to treat a woman on birth control medication who is suffering from PMDD and "associated symptoms" such as PMS.  Indeed, other than SSRI anti-depressants and St. John's Wort – which is not an FDA-approved drug but simply an herbal remedy – Sandoz does not address any specific drug or treatment used for PMDD and PMS.  In particular, Sandoz does not address non-SSRI anti-

9

depressants and non-steroidal anti-inflammatory drugs, such as ibuprofen and aspirin, that are widely used for PMS.[9]

Although Sandoz need not address every conceivable, far-fetched alternative to Yasmin and Yaz for the treatment of PMDD and associated symptoms, it must allege sufficient facts about other treatments to make its proposed product market plausible.  See Hack v. President & Fellows of Yale College, 237 F.3d 81, 86 (2d Cir. 2000) ("To survive a motion to dismiss, however, the alleged . . . product market must be plausible."), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc., 349 F. Supp. 2d 389, 419 (N.D.N.Y. 2004) ("[A] 'court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [alternatives].'" (quoting Gianna Enterprises v. Miss World (Jersey) Ltd., 551 F. Supp 1348, 1354 (S.D.N.Y. 1982))).  Here, Sandoz addresses SSRI anti-depressants and St. John's Wort, but fails to address other available treatments for PMDD and its associated symptoms, including PMS.[10]

In sum, Sandoz has failed to plead sufficient facts to demonstrate that no two-drug combination is an acceptable substitute for Yaz or Yasmin.  See, e.g., B.V. Optische Industrie De

---

[9] The implausibility of Sandoz's product market is apparent in its reference to Loestrin 24 Fe, "the next most popular oral contraceptive after Yasmin/Yaz." (Yasmin Am. Cntrcl. ¶ 46; Yaz Am. Cntrcl. ¶ 49)  Sandoz notes that the FDA-approved label for Loestrin 24 Fe "warns that 'Pregnancies and breakthrough bleeding have been reported by users of combined hormonal contraceptives who also used some form of the herbal supplement St. John's Wort.'" (Id. (citing Warner Chilcott Co., Loestrin FE Final Labeling, available at http://www.loestrin24.com/loestrin/pdf/PPI_loestrin24_fe.pdf))  The FDA labeling cited by Sandoz, however, does not warn users of drug interactions involving anti-depressants or other treatments for PMDD and PMS.

[10] To the extent that "associated symptoms" is read to include acne, Sandoz admits in its counterclaims that other oral contraceptives are approved for the treatment of acne.  (Yasmin Am. Cntrcl. ¶ 41 ("YAZ is one of only a few oral contraceptives that is FDA approved for the treatment of acne" (emphasis added)))  Sandoz does not explain why these other oral contraceptives are not included in the alleged relevant product market.

Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995) ("Simply because this new invention could allegedly do in one X-ray what previously could be done in two x-rays does not necessarily create a relevant market.  Rather, it may well be that older machines requiring two X-rays work better, are more cost-efficient, etc.  It is for this reason that plaintiffs' complaint should allege facts regarding substitute products, and distinguish among comparable products."). Because the alleged product market pleaded in Sandoz's amended counterclaims is not plausible, its claims for monopolization in violation of § 2 of the Sherman Act, conspiracy to monopolize in violation of § 2 of the Sherman Act, and conspiracy in restraint of trade in violation of § 1 of the Sherman Act must be dismissed.[11]

### C.  Sandoz's Attempted Monopolization Claim Fails

Sandoz has also alleged a claim of attempted monopolization in violation of Section 2 of the Sherman Act.  "[T]o demonstrate attempted monopolization[,] a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous  probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).  "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."  Id.; see also AD/SAT, a Div. of Skylight, Inc., 181 F.3d at 226  ("'A threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant' because a

---

[11]  Bayer also alleges that Sandoz has not pleaded a relevant market because Sandoz could not legally enter the pleaded market with its proposed generic product.  Because Sandoz does not intend to seek FDA approval to market its generic contraceptive for the treatment of PMDD and associated symptoms (see Sandoz Br. 18), Sandoz could not lawfully promote its drug for that purpose.  While it is clear that a drug manufacturer promoting its drug for off-label purposes may be subject to criminal penalties, see generally United States v. Caronia, 576 F. Supp. 2d 385, 389 n.2 (E.D.N.Y. 2008); 21 U.S.C. §§ 331, 333, the Court does not reach the issue of whether Sandoz's inability to market its drug for PMDD requires rejection of its pleaded product market.

11

defendant's market share is 'the primary indicator of the existence of a dangerous probability of success.'" (quoting Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 570 (2d Cir. 1990))).

Accordingly, for purposes of its attempted monopolization counterclaim, Sandoz need not plead that Bayer actually possesses monopoly power; facts demonstrating that Bayer has a dangerous probability of achieving monopoly power in the relevant market are sufficient. "Monopoly or market power has been defined as the power to control prices or exclude competition in the relevant market.  Market power may be inferred from a predominant share of the market, but may also exist when an entity does not have a majority of the market share." Syncsort Inc. v. Sequential Software, Inc., 50 F. Supp. 2d 318, 329 (D.N.J. 1999) (internal citations omitted).  "Once the relevant market is determined, we consider a variety of factors in addition to defendant's market share, including the strength of competition, barriers of entry, and the probable development of the market, in order to determine whether there is a dangerous probability that, left unchecked, the defendant will obtain monopoly power. . . ." AD/SAT, a Div. of Skylight, Inc., 181 F.3d at 226-27 (quotations and citations omitted).

In connection with its attempted monopolization counterclaim, Sandoz alleges that the relevant market is the entire oral contraceptive market in the United States.  (See Yasmin Am. Cntrcl. ¶¶ 88, 93 (alleging Bayer's "attempt to monopolize the U.S. oral contraceptive marketplace overall" and "attempt to monopolize oral contraceptive product sales in the United States"); Yaz Am. Cntrcl. ¶ 89)  Bayer does not argue that Sandoz's pleaded market for its attempted monopolization counterclaim is improper, but instead contends that Sandoz has not pled facts demonstrating that it is dangerously probable that Bayer will achieve a monopoly in the U.S. oral contraceptive market.

Sandoz's allegations concerning its attempted monopolization claim are conclusory and speculative. For example, while Sandoz alleges that Bayer's "[s]ales of oral contraceptives . . . constitute approximately half of all oral contraceptive sales in the United States" (Yasmin Am. Cntrcl. ¶ 34; Yaz Am. Cntrcl. ¶ 37), this allegation is contradicted by later assertions in the amended counterclaims that the combined market share of Yasmin and Yaz – as of 2008 – is 29%. (Yasmin Am. Cntrcl. ¶ 44; Yaz Am. Cntrcl. ¶ 47) While Sandoz "believes that since the 29% share figures were published in 2008, Bayer's sales and share of oral contraceptives have continued to increase" (Sandoz Br. 21), this is speculation. Similarly, while Sandoz argues that the sales of Barr's generic drug Ocella should be included in calculating Bayer's market share, accepting that assertion arguendo, Sandoz has provided no information concerning Ocella's sales or market share. In sum, Sandoz's allegation that Bayer controls half of the oral contraceptive market in the United States is conclusory and speculative.[12] See Syncsort Inc., 50 F. Supp. 2d at 330 (rejecting allegation in counterclaim that plaintiff "control[led] the majority of the UNIX sorting market" as a "conclusory recitation of market dominance"; "this single statement of market power in the pleadings . . . is an insufficient allegation of the possession of monopoly power, or even of the dangerous probability of achieving monopoly power").

The 29% market share figure for which Sandoz has provided support is not sufficient to support a claim of actual monopolization. AD/SAT, Div. of Skylight, Inc., 181 F.3d at 229 ("we have held that a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power" (citing Nifty Foods Corp. v. Great

---

[12] Similarly, Sandoz refers to "monopoly prices" and "supracompetitive prices" (Yasmin Am. Cntrcl. 48; Yaz Am. Cntrcl. ¶ 51), but provides no facts concerning pricing that support use of these labels.

13

Atlantic and Pacific Tea Co., 614 F.2d 832, 841 (2d Cir. 1980); Thomas V. Vakerics, Antitrust Basics, § 5.03, at 5-23 ("It would appear rather difficult to establish the dangerous probability element where a defendant holds less than a 40% share of a market, unless other factors indicate the market share figures understate the market power held by the defendant.")). "[A] lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim," however. Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 100 (2d Cir. 1998). "An attempted monopolization claim nevertheless requires [the proponent] to have pleaded [facts demonstrating that its adversary] has a dangerous probability of achieving monopoly power in the relevant market." Syncsort Inc., 50 F. Supp. 2d at 329 (citing Spectrum Sports, 506 U.S. at 456). Factors courts consider in addition to market share include "the strength of competition, barriers of entry, and the probable development of the market." AD/SAT, a Div. of Skylight, Inc., 181 F.3d at 226-27.

In its opposition brief, Sandoz cites no cases in support of its attempted monopolization claim and merely refers the Court to its counterclaim allegations that (1) Bayer controls "approximately half of all oral contraceptive sales in the United States," and (2) "[t]he oral contraceptive industry is mature and is dominated by a small number of large producers." (Sandoz Br. 21-22 (citing Yasmin Am. Cntrcl. ¶¶ 34-38, 44-45))

As discussed above, Sandoz has not pleaded facts demonstrating that Bayer controls 50% of the oral contraceptive market in the United States. Moreover, Sandoz's bare allegation that the oral contraceptive market is "dominated by a small number of large producers" does not support its claim that there is a dangerous probability of Bayer obtaining monopoly power. Indeed, the presence of other large competitors in the market undermines Sandoz's claim. Cf. Foam Supplies, Inc. v. Dow Chem. Co., No. 4:05CV1772 CDP, 2007 WL

4210354, at *5 (E.D. Mo. Nov. 27, 2007) ("The fact that Dow has large competitors as opposed to numerous very small competitors indicates that Dow lacks monopoly power or the ability to obtain such power." (citing In re IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 975 (D.Cal. 1979) (defendant's share is more likely to indicate monopoly power if the rest of the market is widely distributed among many small competing suppliers than it would be if the size of the competitors and the market share held by them approached defendant's size and share))). Likewise, Sandoz's allegations that "dozens of oral contraceptives are available worldwide" (Yasmin Am. Cntrcl. ¶ 36; Yaz Am. Cntrcl. ¶ 39), and that "the most dynamic part of the oral contraceptive market has been among generic manufacturers" (Yasmin Am. Cntrcl. ¶ 35; Yaz Am. Cntrcl. ¶ 38), tend to undermine its argument that Bayer is moving towards monopoly power in this market.

Because Sandoz has not pleaded facts demonstrating that it has a plausible attempted monopolization claim, that claim will be dismissed. See Iqbal, 129 S.Ct. at 1949.

## CONCLUSION

For the reasons stated above, Bayer's motions to dismiss the Fourth Amended Counterclaim in the Yasmin action (08 Civ. 3710) and the Fifth Amended Counterclaim in the Yaz action (08 Civ. 8112) are granted. In light of this Court's earlier dismissal with leave to re-plead, these counterclaims are now dismissed without leave to re-plead. The Clerk of the Court is directed to terminate the motions (Yasmin (08 Civ. 3710) Dkt. No. 152; Yaz (08 Civ. 8112) Dkt. No. 87).

Dated: New York, New York
       September 28, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge